**NORTH PENN GAS COMPANY,
Petitioner,**

v.

**FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,**

Public Service Commission of the State of New York, Consolidated Gas Supply Corporation, Corning Natural Gas Corporation, New York State Electric & Gas Corporation, Intervenors.

No. 82–3212.

United States Court of Appeals,
Third Circuit.

Argued March 1, 1983.
Decided May 13, 1983.

Reuben Goldberg (argued), Goldberg, Fieldman & Letham, P.C., Washington, D.C., for petitioner.

Joel Cockrell (argued), Charles A. Moore, Gen. Counsel, Jerome M. Feit, Sol., F.E.R.C., Washington, D.C., for respondent.

Dennis Lane (argued), Richard A. Solomon, Wilner & Scheiner, Washington, D.C., David E. Blabey, Gen. Counsel, Public Service Com'n of the State of N.Y., Albany, N.Y., for intervenor, Public Service Com'n of the State of N.Y.

William J. Cronin, Huber, Lawrence & Abell, New York City, for intervenor, N.Y. State Elec. & Gas Corp.

John T. Stough, Jr., Morgan, Lewis & Bockius, Washington, D.C., for intervenor, Consol. Gas Supply Corp.

Francis H. Caskin, Morley, Caskin & Generelly, Washington, D.C., for intervenor, Corning Natural Gas Corp.

Before SEITZ, Chief Judge, and WEIS and BECKER, Circuit Judges.

## OPINION OF THE COURT.

WEIS, Circuit Judge.

In arriving at the fair rate a natural gas company may charge its customers, the value of the product in its inventory is a significant factor. In this petition for review, a pipeline company contends that its current higher costs for gas should be used to determine the value of its "stockpile." The Federal Energy Regulatory Commission determined that the original cost of the gas should be used instead, and ordered refunds of rates based on the company's higher valuation. Finding the agency's action to be within its statutory authority, we deny the petition for review.

On April 30, 1979, petitioner North Penn Gas Company filed revised tariff sheets with the FERC seeking an increase in its rates for the sale of natural gas. The Commission suspended implementation of the proposed increase until November 1, 1979 and set the matter for hearing. The parties resolved all of the issues by stipulation except the amount of working capital allowance for gas in storage. After receiving evidence and testimony on that matter, an ALJ determined that North Penn's formula for valuing its gas inventory was not appropriate for rate-making purposes. He prescribed a modification that resulted in a lower rate increase than that proposed by the company.

The Commission affirmed the ALJ's decision in January 1981 and directed that North Penn make refunds for the overvaluation of gas inventory for the period after November 1, 1979. On March 29, 1982, the Commission denied the company's application for rehearing.

North Penn appeals, contending that the FERC erred in rejecting its computation of the stored gas allowance in favor of the one adopted by the ALJ. The company also argues that the Commission lacked authority to order a refund in this case. We consider the contentions seriatim.

### I

Over the years, North Penn has accumulated a substantial amount of natural gas which it keeps in storage. During the winter months, when customer demand is highest, the company draws on its stored supply to supplement gas bought for immediate resale. In the warmer months the inventory is replenished and the average volume of gas remains fairly constant over a period of years. The value of the inventory represents a substantial investment by the company and fair rates must provide for a return through inclusion in the rate base of an allowance designated as part of the working capital.

The price of natural gas has increased substantially in recent years, and this has triggered the controversy between the parties. In simplistic terms, the dispute is whether the beginning gas inventory should

be valued at the higher, current price as North Penn contends, or at the lower, original cost as the FERC decided.

The component of the working capital allowance attributable to stored gas is set out in an FERC regulation as "the average of 13 monthly balances of . . . gas for current delivery from underground storage." 18 C.F.R. § 154.63(f) (Statement E) (1982). A beginning balance and the balance in each of the succeeding twelve months provide the thirteen monthly balances used in the formulation.[1] Gas purchased and placed into storage is referred to as "an injection"; gas removed from storage for sale is "a withdrawal."

The computation begins with North Penn's volume of gas in storage as of December 31. The Commission uses the original cost of that volume as the beginning value balance. For each month during the ensuing year, the amount of injections into and withdrawals from storage are valued at the average LIFO[2] cost of gas for the test year. To determine the worth of the total gas in storage at the end of each month, an adjustment based on the net value of injections and withdrawals for the month is made to the previous month's balance.[3]

Since injections and withdrawals average out over the years, the balance of gas remaining in storage at the end of a year is assumed to be the same as in the beginning.[4] The balance for each of the twelve months and the beginning balance are then added together and the sum is divided by thirteen to produce the working capital component.

North Penn followed a somewhat similar method, with the significant difference that the gas in storage was valued at current prices, not actual cost. The company used as the beginning balance the current value of the gas in storage as of December 31. The balance for each of the other months was determined by taking the amount of gas in storage at the end of the previous month, adjusting it by the net amount of injections and withdrawals for the current month, and then multiplying the resulting volume by the current weighted average cost of gas.[5]

The difference in approaches produces a substantial disparity in result. The Commission calculations yield an allowance of $10,021,177. The company's computation is $15,418,271.

1. FERC regulations require a company to include among its filed schedules a Schedule E–3, "showing the quantities and the respective costs of natural gas stored at the beginning of the test period, the input, output and balance remaining in Mcf [thousand cubic feet] and associated cost by months, method of pricing of input, output and balance, and the claimed adjustments shall be disclosed and clearly and fully explained." 18 C.F.R. § 154.63.

2. The LIFO (last-in, first-out) accounting method is used by North Penn for recording the cost of gas bought and sold during a test year.

3. For example, if the beginning balance is $10 million and the value of withdrawals in January is $1 million, the value of the inventory at the end of January would be shown as $9 million. In the event that injections in February are valued at $500,000, the balance of the inventory at the end of that month would be $9,500,-000. Should March show injections with a value of $600,000 and withdrawals valued at $400,000, the balance at the end of March would be $9,700,000. Adjustments are similarly made for each of the remaining months.

4. The ALJ reached the conclusion that such an assumption is appropriate. The Commission upheld the assumption because "the facilities involved are fully developed and have been operational for a number of years, and there is no proposal here to increase or decrease the certified operation of the storage facilities." Although North Penn challenged this ruling before the Commission, it has abandoned the objection here.

5. As an example, if there were 5 million units of gas in storage as of December 31, multiplying that amount by the current cost of gas would give the beginning balance. If 1 million units were withdrawn in January, the balance at the end of January would be 4 million units multiplied by the current weighted average cost of gas. In the event that February showed 500,000 more units of injections than withdrawals, the current weighted average cost of gas times 4.5 million units would be the balance for the end of that month. Similar computations are made for each of the remaining months and then, as in the Commission's formulation, all balances are added together and divided by thirteen to produce the allowance.

In an era of rising prices, the company's method will result in a higher value for the stored gas and, consequently, a greater allocation to working capital. The company defends its methodology by pointing out that it had been used on previous occasions and accepted by the Commission, not only in North Penn's tariffs, but in other utilities' filings as well. *See Home Gas Co. & The Manufacturers Light & Heat Co.,* 13 F.P.C. 241 (1954), 13 F.P.C. 485 (1954) (on application for rehearing); *The Ohio Fuel Gas Co.,* 13 F.P.C. 280 (1954); *United Fuel Gas Co.,* 12 F.P.C. 251 (1953).

The Commission responds that in the earlier instances the substantial increase in gas prices was not a problem. In addition, the agency emphasizes the advent of "purchased gas adjustment," a significant costing benefit not previously available to the companies.

The purchased gas adjustment was devised to allow utilities to pass on current increases in the cost of natural gas to their customers without the necessity and consequent delay of filing new tariffs. When prices rise, a utility may adjust its rate every six months to track its increased costs. *See* 18 C.F.R. § 154.38(d)(4). Thus, under the adjustment procedure, the company is not subjected to losses for increases in gas costs that had not been anticipated in previously filed tariffs.

The Commission concluded that increasing the value of storage gas to current prices would be improper. It stated, "To the extent that the rates resulting from historical practices are higher than those resulting from the practice adopted in this case, they are in our judgment excessive and therefore unjust and unreasonable."

This court's scrutiny of the Commission's rate-review function is limited. The Supreme Court outlined our role in the *Permian Basin Area Rate Cases,* 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968). "Congress has entrusted the regulation of the natural gas industry to the informed judgment of the Commission, and not to the preferences of reviewing courts. A presumption of validity therefore attaches to each exercise of the Commission's expertise and those who would overturn the Commission's judgment undertake 'the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences.' " *Id.* at 767, 88 S.Ct. at 1360 (quoting *FPC v. Hope Natural Gas Co.,* 320 U.S. 591, 602, 64 S.Ct. 281, 287, 88 L.Ed. 333 (1944)).

The Natural Gas Act provides that "[t]he finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive." 15 U.S.C. § 717r(b) (1976). As to non-factual matters, the court is "to determine whether a rational basis exists for a conclusion, whether there has been an abuse of discretion, or ... whether the Commission's order is arbitrary or capricious or not in accordance with the purpose of the Act." *Ohio Power Co. v. FERC,* 668 F.2d 880, 886 (6th Cir.1982) (citations omitted). *See also Gulf Oil Corp. v. FERC,* 706 F.2d 444, 451–452 (3d Cir.1983).

We also recognize that the Commission may "devise methods of regulation capable of equitably reconciling diverse and conflicting interests," *Permian Basin Area Rate Cases,* 390 U.S. at 767, 88 S.Ct. at 1360, and that it is "free, within the ambit of [its] statutory authority, to make the pragmatic adjustments which may be called for by the particular circumstances," *FPC v. Natural Gas Pipeline Co.,* 315 U.S. 575, 586, 62 S.Ct. 736, 743, 86 L.Ed. 1037 (1942).

The Commission's choice of a method of computation should be upheld if there is a rational connection between it and the facts supported by substantial evidence. *See South Dakota Public Utility Commission v. FERC,* 668 F.2d 333, 337 (8th Cir.1981). Our review however is not merely formalistic for it is our responsibility to determine whether the Commission exceeded or misinterpreted its authority under the Act. *Public Service Commission of New York v. FERC,* 642 F.2d 1335, 1342 (D.C.Cir. 1980), *cert. denied,* 454 U.S. 879, 102 S.Ct. 360, 70 L.Ed.2d 189 (1981) (*"Transco"*). We must also assure ourselves that the Commission has given reasoned consideration to the pertinent factors. *Permian Basin Area*

Rate Cases, 390 U.S. at 792, 88 S.Ct. at 1373. But those who would challenge the Commission's order as resulting in a confiscatory rate must make a convincing showing that it is unjust and unreasonable in its consequences. *FPC v. Hope Natural Gas Co.*, 320 U.S. at 602, 64 S.Ct. at 287.

■ North Penn argues that the Commission erred in not applying its earlier precedents and in rejecting methodology the company had used previously, including once when a post purchased gas adjustment rate increase was approved. The Commission "bears the burden of explaining the reasonableness of [that] departure . . . and any facts underlying its explanation must be supported by substantial evidence." *Columbia Gas Transmission Corp. v. FERC*, 628 F.2d 578, 586 n. 1 (D.C.Cir.1979). We are satisfied that the Commission has met its burden here.

■■ If a given methodology will result in unjust and unreasonable rates, the Commission may not permit its use. That conclusion holds true even if the company had employed that formulation in the past. North Penn's earlier use of its methodology was approved through a settlement in which the pricing of stored gas was not challenged. In addition, the increase for stored gas sought in the present case was, because of the escalation of gas prices, significantly higher than that sought in the earlier filing. Thus, economic circumstances were not the same in both cases.

Institution of the purchased gas adjustment, a practice not followed for any significant time in the past, has undermined the argument for increasing rates by raising inventory valuations. Because higher gas costs are now recovered quickly through the adjustment mechanism, the necessity of financing these gas purchases over a lengthy period of time has been eliminated. Thus, the need to generate additional income by an increased allowance for working capital has not been demonstrated. North Penn's intimations that the Commission's decision is somehow unfair because it breaks with prior orders is therefore without merit. The Commission is not bound to apply precedents rooted in grounds no longer germane.

In addition to disputing the rejection of its methodology, North Penn challenges the Commission's calculations of the inventory valuation and contends that the results of that computation are confiscatory. The argument is that by excluding some $5.4 million from the rate base, the Commission has deprived the company of approximately $500,000 annually.[6] It may be seen that the company's objection is not really to the procedure used in the computation, but to the results caused by valuing the beginning inventory at cost.

The answer to North Penn's contention is that the Commission is required to look at "the bottom line"—the reasonableness of the rate to be charged to the company's customers. The inventory valuation is but one of the factors that must be examined to arrive at a rate fair to the company and customers alike. The Commission carries out its statutory assignment when all of the components are scrutinized and given proper weight in a computation that results in reasonable rates.

■ The record does not demonstrate that the rates the Commission has approved are confiscatory or unfair. It is logical that if one component—the cost of gas—has increased disproportionately to the other factors making up the rate, then special provisions should be devoted to that problem. The purchased gas adjustment addressed that need. It is not necessary, therefore, that the disparate increase in gas prices also be factored into another component—the value of stored gas. To do so would increase the company's revenues without the justification of additional expense.

The fact that the Commission concluded that in the circumstances here inventory should be valued at cost does not establish confiscation or unreasonableness. The company has not met its burden of showing the necessity for all of the increase it request-

---

**6.** The parties stipulated that North Penn's over- all rate of return is 11.10%.

ed.[7] The approach adopted by the agency fairly deals with the realities of North Penn's operation and pricing priorities.

## II.

North Penn's second challenge is to the effective date of the new rates adjusted by the lower working capital allowance. When the Commission's suspension of the new tariff expired on November 1, 1979, the company began to charge its customers the proposed rates. The Commission's action in adopting a reduced inventory valuation resulted in a rate lower than North Penn's customers had been paying since November 1, 1979. The Commission required the company to refund this differential.[8]

North Penn acknowledges that subsection 4(e) of the Natural Gas Act, 15 U.S.C. § 717c(e), authorizes the Commission to direct payment of refunds to the extent that implemented rate increases are not approved.[9] The company argues, however, that the Commission acted pursuant to subsection 5(a), *id.* § 717d(a), which does not grant the power to order refunds.

■ There is no dispute about the authority conferred by the two sections, so the matter to be resolved is whether the Commission could act under subsection 4(e) or only under subsection 5(a). Both provisions permit the agency to determine whether rates set by natural gas utilities are reasonable. The two subsections differ as to the allocation of the burden of proof and the event which triggers initiation of the rate-review proceedings. In a section 4(e) application for a rate increase, the burden of proof is on the company to show that its proposed rate increase is just and reasonable. In section 5(a) proceedings, by contrast, the Commission bears the burden of showing that the existing rate structure results in an unjust and unreasonable rate.

Subsection 4(e) gives the Commission "authority, either upon complaint of any State . . . or upon its own initiative without complaint," to hold a hearing on the lawfulness of a rate whenever a new schedule is filed with the agency. Pending that hearing, the tariff may be suspended for a period not exceeding five months. If the proceeding is not concluded within the suspension period, the proposed rate goes into effect automatically. If the increase or any part of it is not approved, however, the Commission may order a refund with interest.

Subsection 5(a) allows the Commission to reduce rates "after hearing had upon its own motion or upon complaint of any State" which establishes that "the rate . . . is unjust [or] unreasonable." In contrast to subsection 4(e), the review may be initiated without the company filing a new schedule. The proceeding may be triggered by the Commission or other entities. *See United Gas Co. v. Mobile Gas Corp.,* 350 U.S. 332, 341, 76 S.Ct. 373, 379, 100 L.Ed. 373 (1956).

---

7. North Penn also relies on the ALJ's statement that the method presented by the Commission's staff at the hearing, which yielded an allowance of $11.3 million, "seriously undervalue[s] working capital." The ALJ was referring to the staff's pricing of test year adjustments at the considerably lower imbedded LIFO cost from the previous year instead of the current year's LIFO cost. This resulted in lower values being assigned to injections into storage during the test year. What the ALJ did not comment on, however, was the fact that the staff's method also underpriced withdrawals. Thus, the monthly balances were reduced more slowly than under the Commission's formula using current prices. We therefore do not accept the ALJ's comment as a factual finding that an allowance of $11.3 million is an undervaluation.

8. In the stipulation reached on the other aspects of North Penn's rate schedule, the company agreed to make refunds to the extent that its proposed rates were reduced by the provisions of the stipulation. On this appeal, only the Commission's authority to order refunds based on the reduction of the stored gas allowance is at issue.

9. The pertinent part of subsection 4(e) provides:

"Where increased rates or charges are . . . made effective [at the expiration of the suspension period], the Commission may, . . . upon completion of the hearing and decision, . . . order such natural-gas company to refund, with interest, the portion of such increased rates or charges by its decision found not justified."

There is no dispute that the company precipitated the rate examination in this case by filing a new schedule. The subsection 4(e) initiation requirements were thus satisfied. North Penn concedes this much and agrees that the five-month suspension could be imposed. The company contends, however, that since it followed the same methodology for determining the stored gas allowance as it had in previous applications, the Commission's authority under subsection 4(e) was limited to determining the reasonableness of the rates calculated in accordance with that formula. The argument concludes that when the Commission changed the method of computation, it was using powers granted by subsection 5(a), not subsection 4(e), and hence, had no authority to order a refund.

North Penn relies on *Public Service Commission of New York v. FERC*, 642 F.2d 1335 (D.C.Cir.1980), *cert. denied*, 454 U.S. 879, 102 S.Ct. 360, 70 L.Ed.2d 189 (1981) (*"Transco"*). In that case, the utility used previously approved rate differentials for allocating its charges among three delivery zones. In proceedings conducted after a new rate filing, the Commission ordered a new and different allocation among the zones. The court rejected the Commission's argument that "because a company files for higher rates [under section (4)], it bears the burden of proof on those portions of its filing that represent no departure from the status quo." 642 F.2d at 1345.

The zone differentials in *Transco* constituted no part of, and were separate from, the rate increases sought in the filing. *Id.* Thus, *Transco* is far narrower than North Penn reads it. That much was made clear by the same court in *City of Batavia v. FERC*, 672 F.2d 64 (D.C.Cir.1982). There, the court said, "[W]e do not read *Transco* as precluding the Commission from reviewing a revised rate completely to assure that all its parts—old and new—operate in tandem to insure a 'just and reasonable' result and

from ordering refunds if the previously approved [aspect] operates with new provisions to produce an over-recovery." *Id.* at 77. *See also Laclede Gas Co. v. FERC*, 670 F.2d 38 (5th Cir.1982).

 We are persuaded that *Transco* is not applicable to the case at hand, and that in these circumstances, the *Batavia* and *Laclede Gas* opinions [10] present the proper interpretation of the power granted under subsection 4(e). The working capital allowance for gas in storage was an integral part of the rate increase North Penn requested in its section 4 filing. Accordingly, we conclude that the Commission was authorized to direct refunding under subsection 4(e) in this case.

The petition for review of the Commission's orders will be denied.

---

10. In *Laclede,* the court said that, in considering the equities, the Commission could elect to act prospectively under the provisions of subsection 5(a) in lieu of ordering refunds under subsection 4(e). That issue is not before us, but we do not wish to be understood as foreclosing the possibility that the Commission may, in its discretion and under proper circumstances, decline to order refunds under subsection 4(e).