727 F.2d 1342
 NANTAHALA POWER AND LIGHT COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
Tapoco, Inc., Intervenor.
NORTH CAROLINA ELECTRIC MEMBERSHIP CORPORATION and Haywood
Electric Membership Corporation, Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
Tapoco, Inc., Intervenor.
ALUMINUM COMPANY OF AMERICA, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
TOWN OF HIGHLANDS, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
TOWN OF HIGHLANDS, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
Tapoco, Inc., Intervenor.
Rufus L. EDMISTEN, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
Tapoco, Inc., Intervenor.
 Nos. 82-1872(L), 82-1896, 82-2032, 82-2131, 82-1904 and 82-1948.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 6, 1983.
Decided Feb. 24, 1984.
 
 William T. Crisp, Raleigh, N.C. (Robert F. Page, Crisp, Davis, Schwentker & Page, Raleigh, N.C., on brief), for Haywood EMC and North Carolina EMC.
 James N. Horwood, Washington, D.C. (Cynthia S. Bogorad, P. Daniel Bruner, Spiegel & McDiarmid, Washington, D.C., on brief), for Town of Highlands, N.C.
 Joanne Leveque, Washington, D.C. (Charles A. Moore, Gen. Counsel, Barbara J. Weller, Deputy Sol., Washington, D.C., on brief), for F.E.R.C.
 Robert C. Howison, Jr., Raleigh, N.C. (James E. Tucker, Edward S. Finley, Jr., John R. McArthur, Hunton & Williams, Raleigh, N.C., on brief), for Nantahala Power and Light Co.
 Ronald D. Jones, New York City (David R. Poe, M. Reamy Ancarrow, LeBoeuf, Lamb, Leiby & MacRae, Washington, D.C., on brief), for Aluminum Co. of America and Tapoco Inc.
 Robert Harley Bear, Washington, D.C. (Maxwell & Bear, Washington, D.C., on brief), for Rufus L. Edmisten, Atty. Gen. of State of N.C.
 Before MURNAGHAN and CHAPMAN, Circuit Judges and BUTZNER, Senior Circuit Judge.
 CHAPMAN, Circuit Judge.
 
 
 1
 Nantahala Power and Light Company ("Nantahala"), and Aluminum Company of America ("Alcoa") (collectively the "Companies"), the Town of Highlands, North Carolina, Haywood Electric Membership Corporation, North Carolina Electric Membership Corporation, and Rufus L. Edmisten, Attorney General of North Carolina (collectively, the "Customers") petition for review of several orders of the Federal Energy Regulatory Commission (the "Commission" or "FERC"). Tapoco, Inc. ("Tapoco") has intervened in support of the Commission's orders in those cases filed by the Customers. Having determined that the findings of the Commission as to the facts are supported by substantial evidence, we affirm.
 
 
 2
 * Alcoa is a large aluminum producer with a major smelting and fabricating facility located in Alcoa, Tennessee. The company has two wholly owned subsidiaries which own hydroelectric generating facilities on or near the Tennessee River. Both of these produce power at a relatively low cost. One of these companies, Nantahala, serves a public load in southwestern North Carolina; the other, Tapoco, sells all of the electricity it generates to Alcoa for use in its aluminum smelting operations in the town of Alcoa, Tennessee.
 
 
 3
 The hydroelectric facilities owned by Nantahala and Tapoco were originally operated by the two companies. In 1941 however, Alcoa agreed to transfer TVA a major part of Nantahala's land for development of the large Fontana dam site on the Little Tennessee River in Western North Carolina. In conjunction with the transfer, the Fontana Agreement was entered into, pursuant to which TVA received operating control of eight of Nantahala's eleven hydroelectric facilities and all of the hydroelectric facilities owned by Tapoco. In exchange, TVA provided Nantahala and Tapoco with a continuous supply of power which varied according to the streamflow.
 
 
 4
 When the original Fontana Agreement expired in 1962, TVA, Nantahala, Tapoco, and Alcoa, as the parent of Nantahala and Tapoco, executed the New Fontana Agreement (the "NFA"). The provisions of the NFA were essentially the same as the original Fontana Agreement except that under the NFA, TVA gave to Nantahala and Tapoco a fixed amount of power and energy "entitlements," most of which were subject to interruptions and curtailments, in exchange for the output from their plants. The NFA itself did not specify how these entitlements were to be divided between Nantahala and Tapoco; that was up to the companies themselves. In 1963, Nantahala's public load requirements were relatively small, and all of Tapoco's and most of Nantahala's power was being sold to Alcoa for its aluminum manufacturing operations in Tennessee. Consequently, in that year, Nantahala and Alcoa entered into two sales agreements (the "1963 Agreements") which provided that Alcoa would purchase from Nantahala power above that required by Nantahala's public load. Nantahala also received from Alcoa $89,200 per year for allowing TVA to operate Nantahala's plants. Implicit in the 1963 Agreements was a division of the entitlements received from TVA between Nantahala and Tapoco; Nantahala's share equaling the amount it sold to Alcoa plus the amount supplied to its customers.
 
 
 5
 In the late 1960's the public demand for Nantahala's power grew steadily and by the early 1970's had exceeded Nantahala's output. Nantahala ceased to sell power to Alcoa in 1971. Needing new sources of energy, Nantahala entered into two new agreements. The first with Tapoco reapportioned the entitlements received from TVA between the two companies (the "1971 Agreement"). The second was a purchase power agreement with TVA for power Nantahala needed in excess of its annual entitlements.
 
 
 6
 On July 30, 1976, Nantahala filed with the Commission a proposed wholesale rate increase. Nantahala also proposed the use of a Purchased Power Adjustment Clause ("PPAC") to automatically adjust its rates monthly to reflect fluctuations in the cost of power purchased from TVA.
 
 
 7
 The Customers intervened, and a hearing commenced regarding the lawfulness of Nantahala's new rates. The Administrative Law Judge ("ALJ") issued an Initial Decision disallowing a portion of the rate increase. The ALJ found Nantahala's PPAC unlawful. He also found that Nantahala should have received greater entitlements under the 1971 Agreement and concluded that for every kWh of entitlements it should have received under the 1971 Agreement but did not, Nantahala would have been able to purchase one less kWh of power from TVA under its purchase power agreement. Thus he reasoned that there were in Nantahala's cost of service higher levels of power and energy purchased from TVA than there should have been. As a result, Nantahala was ordered to refund to its customers the extra money it had collected from them to pay for, what the ALJ believed to be, unnecessary purchases. The ALJ, however, refused to consolidate Tapoco and Nantahala for ratemaking purposes, as had been proposed by the Customers.
 
 
 8
 In Opinion No. 139 and an Order (the "May 14 Order"), the first of the three orders under review, the Commission affirmed the ALJ's rejection of the PPAC, his finding that the 1971 Agreement was unfair to Nantahala, and his refusal to consolidate Tapoco and Nantahala for ratemaking purposes. However, the Commission increased Nantahala's rates above the level determined by the ALJ by making an adjustment in the entitlements it found Nantahala should have received.
 
 
 9
 In response to petitions for rehearing, the Commission issued Opinion No. 139-A and an Order (the "September 30 Order"), in which it altered its prior decision by allowing Nantahala to retain amounts it would have collected had it filed a lawful fuel adjustment clause for the period in question rather than a PPAC. The Commission adhered to this modification of Opinion No. 139 in Opinion No. 139-B.
 
 II
 
 10
 The scope of judicial review of Commission orders is limited. It is not the function of this court to reweigh the evidence and draw inferences therefrom. Rather, the role of this court is to ensure that the findings of the Commission are supported by substantial evidence 16 U.S.C. Sec. 825l (b). It is from this perspective that we examine the various contentions of the parties.
 
 A.
 
 11
 The first order of the Commission for which review is sought concerns the 1971 Agreement. Commission scrutiny of this transaction is necessitated by the corporate structure of Alcoa. Both Nantahala and Tapoco are wholly owned subsidiaries of Alcoa. As a result, transactions between the two subsidiaries cannot be presumed to be as fair as they would be if Nantahala and Tapoco were independent entities.
 
 
 12
 The opportunity for unfair treatment here is coupled with an incentive on the part of Alcoa to favor Tapoco in transactions between the two subsidiaries. Nantahala sells power to a public load; Tapoco sells power directly to Alcoa. As a consequence, any transaction between Nantahala and Tapoco that benefits Tapoco, will also benefit Alcoa and at the same time work to the detriment of Nantahala's customers. In the context of the 1971 Agreement, a division of entitlements favoring Tapoco would allow Alcoa to purchase less power, and require Nantahala (and ultimately its customers) to purchase more power, from TVA.
 
 
 13
 The ALJ found, and the Commission affirmed, that the 1971 Agreement between Tapoco and Nantahala was in fact unfair to Nantahala; that it provided Tapoco with a disproportionate share of the entitlements received from TVA. Both parties object; the Customers challenge the Commission's decision not to make even more adjustments in the terms of the 1971 Agreement than it did; Nantahala contends the Commission should not have made any adjustments at all.
 
 
 14
 The entitlements that Tapoco and Nantahala received from TVA are comprised of three elements. The "capacity entitlements" define the rate at which a company is entitled to receive energy at any given time. The "energy entitlements" on the other hand reflect the total amount of energy a company is entitled to over a given period. Unlike capacity, which is measured in kilowatts of power, energy is measured in kilowatt hours. The third, "peaking deviation entitlements," not at issue in this case, measure availability of energy during peak periods.
 
 
 15
 In determining what constituted a fair division of entitlements under the 1971 Agreement, the Commission could have used either of two approaches. The first would have been to compare the 1971 Agreement with the 1963 Agreements. Assuming the 1963 Agreements were fair, which the parties apparently do, the Commission would have been required to make sure that all the benefits Nantahala lost under the 1971 Agreement were offset by new advantages. The second approach would be to calculate the two companies' relative contributions to TVA and compare them to the relative share of entitlements each received under the 1971 Agreement. The Commission decided to use the second approach.
 
 
 16
 Under the NFA, the two companies could expect to receive 1,800 million kilowatt hours of energy entitlements annually. The Commission staff calculated that Nantahala's relative share of the combined generation of the plants turned over to TVA was 22%. Accordingly, the Commission determined that Nantahala should have received 22%, or 404 million of the 1800 million kilowatt hours available to Tapoco and Nantahala. Since Nantahala only received 360 million kilowatt hours under the 1971 Agreement, the Commission reasoned that Nantahala had purchased from TVA 44 million kilowatt hours of energy more than it should have, and these excessive purchases should not have been reflected in Nantahala's rates.
 
 
 17
 Nantahala and Alcoa contend that the Commission erred by not considering the necessary additional costs resulting from the imputation of additional entitlements to Nantahala. They observe that energy entitlements conveyed by TVA under the NFA were of two types: (1) primary (or firm) energy, which is subject to no interuptions and which is readily usable for serving a public load; and (2) secondary (or non-firm) energy, which cannot be used for serving a public load unless an alternative supply of energy is available when prolonged interruptions occur.
 
 
 18
 Nantahala's allocation under the 1971 Agreement consisted of all primary energy. The Companies assert that of the 404 million kWh per year of entitlements attributed to Nantahala under the Commission's orders, only 240 million kWh per year is primary energy while the rest, 163 million kWh per year, is secondary energy. Since secondary energy is not immediately usable for a public load as is primary energy, they argue an alternative supply of energy is necessary to "firm up" the interruptible energy to make it useable for a public load. The Commission, they maintain, failed to consider the costs of this back-up source of energy when it set Nantahala's rates based on its reallocation of the TVA entitlements. To demonstrate the magnitude of these costs, the Companies attempted to introduce into evidence a study detailing the costs of supplying "firming power" to Nantahala by installation of a standard size internal combustion turbine.
 
 
 19
 The fallacy in the Companies' argument lies in their assumption that the Commission mandated a proportionate allocation of the two types of energy. In the September 30 Order, the Commission explicitly stated that this was not the case:
 
 
 20
 In determining just and reasonable rates in Opinion No. 139, the Commission did not choose to reform the 1971 Apportionment Agreement and was not concerned with the mechanics of how entitlements of energy from TVA are allocated to each party, as long as each party receives its fair share of energy based on that party's contribution of actual energy turned over to TVA. The mechanics of the proportions of both primary and secondary energy available from TVA rests with the parties. Our concern is that each party receive its proper entitlement.
 
 
 21
 20 FERC p 61,430, at 61,871.
 
 
 22
 The Commission obviously anticipated that the parties would continue to allocate the energy entitlements in an optimal manner--Nantahala's share of entitlements consisting of primary energy and Tapoco's share consisting of the primary energy not allocated to Nantahala plus all of the secondary energy.[1] Any other arrangement (including a proportionate allocation of each type of energy) would raise the total cost of power produced by the two companies. In setting Nantahala's rates, the Commission was clearly not obligated to consider increases in costs associated with a non-optimal division of entitlements.
 
 
 23
 The Commission found the capacity provision of the 1971 Agreement fair. Although the 1971 Agreement reduced Nantahala's capacity entitlements from 68,300 kilowatts to 54,300 kilowatts of assured capacity, Nantahala still received more under the agreement than its relative contribution to the assured capacity that went into the TVA arrangement. Given this and other testimony in the record as to the reasonableness of the capacity apportionment, we cannot agree with the Customers' contention that the Commission's opinion is unsupported by reasoned analysis or substantial evidence.
 
 B
 
 24
 In the proceedings below, the Customers requested, and the Commission declined to, "roll-in" or consolidate Nantahala and Tapoco for ratemaking purposes. The Customers contend that the Commission's decision was based on inconsistent and illogical reasoning, and findings unsupported by substantial evidence.[2] In essence, the Customers argue that the corporate structure created by Alcoa was part of a plan to secure for itself the large quantities of low-cost power it requires for its smelting process. Alcoa, they claim, set up multiple corporations to attempt to make lawful what would be unlawful if it had developed the Little Tennessee River through a single corporation: the assignment of its least expensive utility resources to its exclusive service, requiring the public to rely on the relatively expensive portion of the resources.
 
 
 25
 Of course, Nantahala's corporate framework is not the source of the conflict between Alcoa and the Customers. Given the quasi-monopoly nature of public utilities, the interests of their shareholders and their customers will always be divergent. For example, shareholders will usually benefit, and customers usually will be adversely affected by higher rates. The role of the Commission is not to eliminate this divergence of interests; rather it is simply to ensure that the regulated companies treat their customers fairly. In practice, this means that the Commission must scrutinize the rates utilities charge to make sure they are not excessive.
 
 
 26
 The fact that Nantahala is part of a multi-corporate structure, rather than a single corporate entity, does not affect the nature of customer-shareholder conflict, it only increases the number of situations in which the conflict can arise. Under the Nantahala framework, the utility's shareholder (Alcoa) can unfairly benefit vis-a-vis its customers not just directly through excessive rates, but also indirectly, by shifting resources from Nantahala to Alcoa, through Nantahala's sister corporation, Tapoco. The Commission's role is the same under these circumstances: to ensure that the customers are treated fairly. The burden on the Commission is increased, however, as it must not only scrutinize the rates Nantahala charges its customers but also the fairness of all transactions allocating resources between Tapoco and Nantahala. If the Commission is able to meet this additional burden and if there are legitimate reasons for maintaining separate corporate identities, there is no statutory requirement for consolidating the costs of the two subsidiaries.
 
 
 27
 We find that there is substantial evidence to support the Commission's determination that consolidation of costs was not necessary in this instance. The Commission examined various indicia that are commonly considered when a suggestion of consolidated costing is raised and made the following findings: (1) Nantahala began in North Carolina and Tapoco in Tennessee; (2) Nantahala serves a public load in portions of North Carolina and Tapoco's market is Alcoa in Tennessee; (3) each company has its own management; (4) the generating sources are for the most part on different segments of the Little Tennessee River or its environs.
 
 
 28
 There is also evidence that Nantahala's development was at least in part shaped by the needs of Alcoa; that Tapoco has in the past assumed public service responsibilities; and that Tapoco was domesticated in North Carolina. While all of this evidence does suggest a basis for the Commission to order rolled-in costing, it does not compel the conclusion that the Commission must, as a matter of law, consolidate costs for ratemaking purposes. A decision to order roll-in is essentially a matter of Commission discretion and we find that the Commission decision not to order a roll-in is supported by substantial evidence. See Georgia Power Co., 52 FPC 1343 (1974).
 
 
 29
 Given that the corporate identities of Nantahala and Tapoco are respected for ratemaking purposes even though the two companies have a common parent, it is incumbent upon the Commission to examine all transactions between Nantahala and Alcoa, as well as all transactions negotiated by Alcoa on behalf of Nantahala. See Indiana & Michigan Dist. Ass'n v. FERC, 659 F.2d 1193, 1197 n. 11 (D.C.Cir.1981). One such transaction, already discussed, is the 1971 Agreement. A second is the New Fontana Agreement. In the NFA, Alcoa and its subsidiaries transferred operating control of Nantahala and Tapoco's plants to TVA in return for certain energy entitlements. The Customers contend that any findings made by the Commission as to the justness and reasonableness of the NFA are without substantial evidence.
 
 
 30
 In reaching an agreement with TVA, Alcoa's negotiators were not only required to consider Alcoa's needs but also the different, and often conflicting, needs of Nantahala.[3] In attempting to demonstrate that the negotiators failed to do so, the Customers call attention to evidence in the record showing that the NFA entitlements were shaped to meet Alcoa's load, rather than Nantahala's public utility load. In essence, the Customers argue that in the negotiations Alcoa traded away dependable capacity and primary (non-curtailable) energy in order to increase the availability of secondary energy to a form usable under Alcoa's unique load pattern.
 
 
 31
 That substantial weight in the NFA went to Alcoa's needs is not conclusive proof that Alcoa sacrificed the Customers' interests to that of the Alcoa aluminum operations. It should be expected that more emphasis would be given to Alcoa's requirements than Nantahala's given the fact that Tapoco is much bigger than Nantahala, and in the early years of the NFA, even some of Nantahala's power and energy was sold to Alcoa.
 
 
 32
 The Customers also place great importance on the testimony of Howard B. Forman and David A. Springs which indicated that the composition of entitlements received from TVA resulted in excessive purchased power costs for Nantahala. Contradicting their statements, however, was the testimony of George Popovich who stated that he believed that TVA would not have agreed to provide more capacity entitlements than are presently in the NFA.
 
 
 33
 The Commission was satisfied that the package negotiated was an acceptable one from an overall perspective. Reviewing the evidence, we find that there is substantial evidence in the record to support this determination.
 
 C.
 
 34
 In its filing with the Commission, Nantahala proposed use of a purchase power adjustment clause that would permit the Company to track the cost of power it had purchased from TVA, and thus automatically recover those costs from its customers, without making rate filings with the Commission.
 
 
 35
 The Commission rejected the company's proposal. That is not in issue here; what is in issue is the Commission's determination of what would be done with the monies collected by Nantahala under this clause before the Commission rejected it. The Commission allowed Nantahala to keep as much of the monies as it would have been entitled to if Nantahala had submitted a fuel adjustment clause[4] instead. A fuel adjustment clause is part of the tariffs of most utilities subject to Commission jurisdiction; a utility is entitled to use the clause if it makes a filing in conformance with the Commission's rules. Although Nantahala had not made such a filing, the Commission permitted it to calculate its refunds as if it had.
 
 
 36
 Both Nantahala and the Customers object to the Commission's treatment of the refunds. The Customers object to the Commission's decision to allow recovery under the substitute formula. They argue that the Commission should have required Nantahala to refund the full amount it improperly collected under the PPAC. We disagree. Fuel adjustment clauses are allowed as a matter of course to utilities, if requested. Thus, the Commission was not allowing Nantahala to keep funds in excess of those determined to be just and reasonable as the Customers allege. Rather, since Nantahala would almost certainly have been entitled to recover its costs under a fuel adjustment clause had it made proper filings, a decision to not allow them recovery under one now would be in effect to impose a penalty on the utility for choosing to use a PPAC instead of a fuel adjustment clause.
 
 
 37
 Given that the question whether to order refunds of portions of a rate that the Commission failed to approve is essentially a matter of Commission discretion (Second Taxing District of the City of Norwalk v. FERC, 683 F.2d 477, 490 (D.C.Cir.1982); Ecee, Inc. v. FERC, 645 F.2d 339, 353 (5th Cir.1981); Belco Petroleum Corp. v. FERC, 589 F.2d 680, 686 (D.C.Cir.1978)) and given the magnitude of the penalty in this case, we find the Commission's decision not to require a full refund a reasonable exercise of its discretion.
 
 
 38
 Nantahala, on the other hand, takes exception to the Commission's refusal to give it the opportunity to show that its PPAC did not result in a rate of return greater than the approved rate of return. During the hearings held below, Nantahala offered evidence purporting to show that unless it was allowed to keep amounts collected under its PPAC, it would not recover its actual costs for 1976, 1977 and 1978. In excluding the evidence of post-test year costs, the ALJ and Commission followed the Commission's long-established practice, favoring reliance on costs in the test year(s) chosen by a utility rather than introduction of data from later years (revision of cost estimates in light of subsequently-obtained data).
 
 
 39
 There are strong policy considerations for relying on test year costs. Such reliance serves to prevent unfairness to the parties, prevents undue delay in rate cases, and preserves the system of test-year ratemaking. As was observed in Boston Edison Co., 55 FPC 2953 (1976), "to permit after-the-fact justification of a rate increase would emasculate our test period regulations, unduly burden the evidentiary presentations of all other parties, and act as an incentive to applicants delaying adjudicatory proceedings."
 
 
 40
 Nantahala relies heavily on this court's opinion in Lockhart Power Co. v. FERC, 628 F.2d 1349 (4th Cir.1980) (unpublished), where the court did decide on the peculiar facts of that case, that the Commission should decide whether the rates collected under a PPAC were justified even though the clause was rejected. The unusual circumstances which led the court to give Lockhart an opportunity to present evidence of its actual costs during the period in question are absent here.
 
 
 41
 Most important, the lack of notice, which was the court's principal concern in Lockhart, is not present here. Lockhart's PPAC had been approved by the South Carolina Public Service Commission in 1970; the federal Commission asserted jurisdiction over Lockhart in 1975. Slip Op. at 3-5. The Commission first disapproved Lockhart's PPAC at the end of its rate case; it was then faced with a refund obligation which extended back to September 1, 1974, prior to the time the Commission declared that Lockhart was subject to its jurisdiction, and had required Lockhart to submit its rates for federal scrutiny. Nantahala, on the other hand, used a PPAC for three and one-half years after the Commission had rejected it in a prior rate case.
 
 
 42
 In essence, Nantahala had ample warning that its proposed PPAC was not assured of success and declined to take advantage of alternative opportunities presented to see that its costs and revenues were kept in balance as future costs rose over the 1977-1980 period. It should justify what it is doing before, not after, the fact. Given the Commission's broad authority to order refunds, we find the Commission did not abuse its discretion in denying Nantahala the opportunity to justify the rates it charged under its PPAC.
 
 D.
 
 43
 The final issue is whether the Commission properly denied Nantahala's inclusion of depreciation on certain facilities as a part of the company's cost of service. The facilities at issue were built during World War II. As such, the company was allowed to write off the properties for tax purposes over a five year period; depreciation was accounted for on the company's books on the same basis. During these years and for many years thereafter, Nantahala's rates were not regulated by the Commission. In the 1960's, however, the Commission began to regulate Nantahala's wholesale rates.
 
 
 44
 In the mid-1970's, the company requested permission from both the North Carolina Utilities Commission and the Federal Energy Regulatory Commission to restate or "normalize" the depreciation reserve and expenses as stated on its books to reflect their straight line normal useful life. This would have an impact on its current cost of service. One of the items the Commission allows in the cost of service is a depreciation charge which is designed to permit the company to collect back from its ratepayers the amount it has invested in physical property; another is a return on the as-yet-undepreciated portion of the facilities. In the rate filing Nantahala submitted to the Commission in 1976, a charge was included for these items.
 
 
 45
 However, Nantahala was unable to persuade either the ALJ or the Commission that it had not already recovered these amounts from its ratepayers, and failing this, the Commission was unwilling to permit Nantahala to collect them from current ratepayers. The Commission observed that it "did not know what Nantahala's ratemaking practice was for an approximate 23-year period before it became subject to this Commission's jurisdiction," and found that the unsupported statements by Nantahala's witness did not constitute sufficient record evidence to support the company's proposed change.
 
 
 46
 Nantahala argues that the Commission's refusal to acknowledge a finding of fact of the North Carolina Utilities Commission that Nantahala had not recovered all costs of its wartime facilities and its placing the burden of proof on this issue upon Nantahala constituted reversible error. In the alternative, Nantahala asks to be granted leave to adduce new evidence before the Commission.
 
 
 47
 A utility bears the burden of justifying each component of a rate increase, and the overall increase itself, under Sec. 205(e) of the Federal Power Act. Because a regulated utility is the party with access to the necessary information, it bears the risk of an undeveloped or inconclusive record.
 
 
 48
 The case relied upon by Nantahala, Public Service Comm'n of New York v. FERC (Transco), 642 F.2d 1335 (D.C.Cir.1980), cert. denied, 454 U.S. 879, 102 S.Ct. 360, 70 L.Ed.2d 189 (1981) is not to the contrary. In Transco, the utility practice in question--natural gas pipeline's method of allocating costs among customers--"[was] no part of Transco's argument for higher rates." 642 F.2d at 1345. Here the issue of depreciation is an integral part of the rate increase sought by Nantahala. See North Penn Gas Co. v. F.E.R.C., 707 F.2d 763, 769 (3d Cir.1983). Moreover, in Transco, the Commission had previously approved the utility practice at issue. 642 F.2d at 1339. In contrast, the treatment of depreciation at issue in this case has not been raised in a previous case and thus is under scrutiny by the Commission for the first time.
 
 
 49
 The North Carolina Utility Commission's approval (in 1975) of Nantahala's restatement of depreciation is clearly not binding on the FERC. Its decision was based on its assessment of the evidence. The Commission is clearly entitled to make its own assessment of the evidence before it.
 
 
 50
 Nantahala has petitioned this court to adduce new evidence before the Commission, relying on Section 313(b) of the Federal Power Act, 16 U.S.C. Sec. 8251(b), which empowers the court to order additional evidence to be taken if the petitioning party demonstrates to the court's satisfaction that the evidence described is material and that there were reasonable grounds for failure to adduce the evidence in proceedings before the Commission.
 
 
 51
 Nantahala cites in its petition the "nature and age of the documents, combined with Nantahala's limited resources," explaining:
 
 
 52
 [T]hese are old documents in closed files. They were not discovered after diligent searches earlier, but have been found after persistent efforts over an extended period of time. Nantahala is not a large corporation with large resources at its disposal. It is a small company, with very limited resources and personnel.
 
 
 53
 It should be noted however, that Nantahala had three and one-half years from the time Nantahala's customers raised a challenge to Nantahala's treatment of this item until the close of the record to find these documents. To its limited resources can be added those of Alcoa which will benefit from any increased rates resulting from a favorable decision on the depreciation issue.
 
 
 54
 While courts do possess the authority to require reopening the record to take additional evidence, that authority has been exercised very sparingly. Courts have recognized the necessity of having a conclusion to the administrative process. See Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 554-555, 98 S.Ct. 1197, 1217, 55 L.Ed.2d 460 (1978); Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 294-296, 95 S.Ct. 438, 446-447, 42 L.Ed.2d 447 (1974); RSR Corporation v. FTC, 656 F.2d 718, 720-721 (D.C.Cir.1981). This case falls far short of demonstrating "the most extraordinary circumstances" necessary to justify compelling the agency to reopen the record. Bowman, 419 U.S. at 296, 95 S.Ct. at 447. Here, what is sought would not encompass changed circumstances, but merely evidence the party failed to discover and introduce in the first instance. Accordingly the Petition for Leave to Adduce New Evidence is denied.[5]
 
 CONCLUSION
 
 55
 For the foregoing reasons, we affirm all decisions of the Commission in this case.
 
 
 
 [1]
 While Nantahala's public load requires primary energy unless back-up power is available, Tapoco's sole customer, Alcoa, can utilize either primary or secondary energy
 
 
 [2]
 The Customers also protest the Commission's failure to restore the $89,200 annual payment which Nantahala received from Alcoa under the 1963 Agreements but not under the 1971 Agreement. As noted earlier, the Commission based its assessment of what constituted a fair allocation of entitlements on what each company received from TVA relative to their respective contributions to TVA, and not on a comparison of the 1971 Agreement to the 1963 Agreements. Thus if Nantahala received its fair share of energy and capacity entitlements under the 1971 Agreement, no payment by Nantahala would be necessary
 
 
 [3]
 Alcoa's smelting operation runs continuously, and thus requires a continuous and constant power supply. The demand of a public service load, such as Nantahala's, fluctuates during the day and over the seasons so it requires a power supply which can follow its load and meet its daily and seasonal peaks and valleys. While Alcoa's smelting load can tolerate interruptions in supply, a utility serving the public cannot, unless backup power is available
 
 
 [4]
 A fuel adjustment clause is designed to automatically pass on to consumers costs associated with fuel. Here, such a clause would cover only those cost increases to Nantahala passed on to TVA due to TVA's increased fuel costs. It would not pass on to Nantahala's customers TVA's non-fuel related costs even though those costs would be charged to Nantahala by TVA. (The major component of non-fuel related costs is a demand charge. A demand charge is assessed based on the amount of capacity that must be provided to meet the customer's demands. It is designed to recover fixed costs, like depreciation and return on rate base, which will be incurred regardless of the level at which the utility is operating.) In contrast, a purchase power adjustment clause automatically passes on to consumers all increases in the cost of power purchased from an outside supplier. In the present context, a PPAC would allow Nantahala to pass on to consumers the full amount of any increase in cost of power it purchased from TVA
 
 
 [5]
 In ruling that Nantahala failed to justify its current depreciation practice related to wartime investment, the Commission has by no means precluded Nantahala from justifying its practice for rates subsequent to the locked-in period at issue in this case. The Commission recently instituted a new proceeding on this issue, in which Nantahala will have the opportunity to introduce its new evidence, and whatever other evidence it possesses, to justify its depreciation of wartime investment in rates beginning March 1, 1981. Nantahala Power & Light Co. 21 FERC p 61,090 (November 22, 1982)