795 F.2d 182
 254 U.S.App.D.C. 137
 SEA ROBIN PIPELINE COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Gulf Oil Corporation, Southern Natural Gas Company, Intervenors.
SEA ROBIN PIPELINE COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Southern Natural Gas Company, Chevron U.S.A. Inc., Intervenors.
SEA ROBIN PIPELINE COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Southern Natural Gas Company, Intervenor.
 Nos. 85-1446, 85-1551 and 85-1693.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued June 3, 1986.
Decided July 15, 1986.
 
 Irving Jacob Golub, with whom Jeron L. Stevens and George R. Diaz-Arrastia were on brief, for petitioner in Nos. 85-1446, 85-1551 and 85-1693.
 Joel M. Cockrell, Atty., F.E.R.C., with whom William H. Satterfield, Gen. Counsel, Jerome Feit, Sol., and Joshua Z. Rokach, Atty. F.E.R.C., were on brief for respondent in Nos. 85-1446, 85-1551 and 85-1693. A. Karen Hill, Atty., F.E.R.C., also entered an appearance, for respondent.
 David R. Stevenson entered an appearance, for intervenors, Gulf Oil Corp., et al., in Nos. 85-1446 and 85-1551.
 Donna J. Bailey and James J. Flood, Jr. entered appearances, for intervenor, Southern Nat. Gas Co., in Nos. 85-1446, 85-1551 and 85-1693.
 Before GINSBURG, STARR and SILBERMAN, Circuit Judges.
 Opinion for the Court filed by Circuit Judge GINSBURG.
 GINSBURG, Circuit Judge:
 
 
 1
 In this case, we review two sets of Federal Energy Regulatory Commission (FERC or Commission) orders. In the first, and principal order on review, FERC required Sea Robin Pipeline Co. (Sea Robin) to change its method of calculating the rate attributable to the transportation service it provided to Gulf Oil Co. The change in methodology yielded lower rates for Sea Robin's other customers and FERC ordered the pipeline to refund the difference between the lower rates mandated by the Commission's opinion and the rates those customers had paid since June 1, 1980. See Opinion No. 227-A, 31 F.E.R.C. p 61,188 (May 21, 1985). In a later order, FERC directed the pipeline to modify a subsequent rate filing to reflect the Gulf rate treatment instructed by the Commission in its principal order. See Order Accepting for Filing and Suspending Tariff Sheets, 32 F.E.R.C. p 61,119 (July 24, 1985). We conclude that the record does not contain substantial evidence supporting FERC's initial direction of a change in the Gulf rate treatment. We therefore reverse the orders challenged by petitioner.
 
 I.
 
 2
 The Natural Gas Act, 15 U.S.C. Sec. 717 et seq. (1982) (NGA or Act), both empowers FERC to regulate the rates charged by interstate natural gas pipelines, and prescribes how FERC may exercise that power. Sections 4 and 5 of the Act govern Commission superintendence of rates. Each section deals with a different character of agency action; each is responsive to different circumstances, and is subject to different restrictions. The Commission is not free to blend, or pick and choose at will between, its section 4 and 5 authority; FERC must use the appropriate authorization in the appropriate way in order to remain with the bounds Congress has set for the agency.
 
 
 3
 Under section 4 of the NGA, 15 U.S.C. Sec. 717c, pipelines must file with the Commission all rates and any change they propose in their rates. If the Commission enters upon a hearing concerning the lawfulness of a proposed rate increase, the pipeline bears the burden of proving that the rate sought is just and reasonable. See id. at Sec. 717c(e). Section 4 limits the Commission's authority to acceptance (in whole or in part) or rejection of the pipeline's proposed rates; the section does not authorize FERC to substitute rates of its own design for the rates proposed by the pipeline. See Public Service Commission of New York v. FERC, 642 F.2d 1335, 1344 (D.C.Cir.1980) (Transco ). This restriction guarantees that rates generally will be set, in the first instance, by the pipelines themselves. The Commission, however, has broad remedial powers under section 4. FERC may suspend the proposed rate for up to five months and if, after a hearing, the Commission decides that the rate was unjust, it may order the pipeline to refund to its customers the excessive portion of the charges collected under the rate. See 15 U.S.C. Sec. 717c(e).
 
 
 4
 Section 5 of the Act, 15 U.S.C. Sec. 717d, empowers the Commission, in certain circumstances, to take the initiative in setting rates. The Commission may order a pipeline to change to a specified new rate, either pursuant to a staff proposal or at the request of a third party, if FERC finds that the existing rate is unjust or unreasonable and the proposed new rate is both just and reasonable. See id. at Sec. 717d(a). The proponent of the change--whether the Commission staff or a third party--bears the burden of proof under section 5. See, e.g., ANR Pipeline Co. v. FERC, 771 F.2d 507, 514 (D.C.Cir.1985). FERC's remedial power under section 5 is limited to prospective relief: the Commission cannot order a refund of past payments made under the revoked rate. See FPC v. Louisiana Power & Light Co., 406 U.S. 621, 643-44, 92 S.Ct. 1827, 1839-40, 32 L.Ed.2d 369 (1972).[1] This limitation allows the pipeline to rely on a filed rate, once the Commission has permitted it to become effective, until such time as the rate is proved to be unlawful.
 
 
 5
 The Commission's authority under sections 4 and 5 need not be exercised in separate proceedings. If, in the course of a section 4 proceeding, FERC decides to take action authorized by section 5, the Commission may do so without initiating an independent proceeding. See Initial Decision, 26 F.E.R.C. p 63,072, at 65,289 (Feb. 24, 1984) (ALJ Decision). But section 5 authority, regardless of the context in which it is exercised, may be pursued only in accordance with the requirements and constraints imposed by section 5.
 
 II.
 
 6
 Since 1971, Sea Robin Pipeline has had a contract with Gulf Oil which obligates Sea Robin to transport Gulf's gas at a fixed price[2] of 3.98 cents per Mcf. This rate is not cost-based. Most of Sea Robin's customers[3] pay rates derived from a division of the pipeline's total costs by the total volume transported for those customers. These rates are subject to change--after filing with FERC--as the costs of service change. Under Sea Robin's longstanding methodology, the revenues received from the arrangement with Gulf were credited against the costs of operation; by lowering those costs, Gulf's payments reduced the rates that the other customers paid.
 
 
 7
 In 1979 and 1980, Sea Robin filed with FERC proposals to increase most of its rates. The proposals did not alter in any way Gulf's fixed rate treatment. The Commission suspended the rates for five months, then let them go into effect subject to refund pending a full hearing.
 
 
 8
 At the hearing, the Commission staff, although concentrating on issues of greater consequence, raised questions concerning the rate treatment for Gulf. The staff presented the testimony of one witness: Robert Machuga, a staff expert on rate design and cost allocation. Machuga expressed concern that if the rate charged Gulf was not high enough to cover the cost of the service, then Sea Robin's methodology would result in the other customers subsidizing Gulf: their rates would be based on a formula that included the costs of service that Gulf, and not they, received. Using Sea Robin's contracts with other customers for apparently similar service as his guide, Machuga estimated that the cost-based rate Gulf would pay if it were treated like the other customers was 10.01 cents per Mcf, more than twice its present rate. See Joint Appendix (J.A.) at 8, 11. The witness concluded that Sea Robin should be ordered to change its methodology and derive its rates from a formula in which Gulf was treated the same way as the other customers.[4]
 
 
 9
 The parties to the proceeding, including the FERC staff, subsequently settled most of the issues in the case. The settlement specified how Sea Robin was to determine its regular, cost-based rates and the refunds that it was to pay to its customers. The settlement also stated: "One of the issues litigated ... was the rate treatment to be accorded [the Gulf transportation]. The parties agree that the Gulf Transportation Issue ... shall be resolved on the basis of the record developed at the hearings which were conducted ... and agree to be bound ... by the Commission Order which becomes final and is no longer subject to appellate or administrative review, resolving the Gulf Transportation Issue...." Stipulation and Agreement at 5, reprinted in Brief for Respondent FERC at 4.
 
 
 10
 The Gulf transportation issue was thereafter presented to an Administrative Law Judge (ALJ). The ALJ believed that the question posed by the settlement agreement was whether or not to change the rate paid by Gulf. Because the change had been proposed by the FERC staff rather than the pipeline, the ALJ held that this was an invocation of section 5 power, therefore the Commission staff bore the burden of proving both that the existing rate was unjust or unreasonable and that the proposed new rate was just and reasonable. The ALJ concluded that the meager evidence then in the record on this issue was insufficient to meet the staff's burden. Accordingly, he upheld the existing rate. See ALJ Decision, 26 F.E.R.C. at 65,289-90.
 
 
 11
 The Commission, in reviewing this decision, declared that the ALJ had misstated the issue. FERC believed the question was whether the pipeline's practice of charging a cost-based rate to its other customers but not to Gulf was unjust or unreasonable, particularly in light of the pipeline's request to raise the rates for these other customers. The Commission considered the existing record inadequate to resolve this issue and remanded to the ALJ for further fact finding. See Opinion No. 227, 29 F.E.R.C. p 61,283, at 61,581 (Dec. 17, 1984).
 
 
 12
 Sea Robin and Gulf petitioned for reconsideration, arguing both that the Commission, not the ALJ, had misstated the issue and that the settlement precluded supplementing the record. The Commission granted reconsideration and reaffirmed its statement of the question involved, but acknowledged that the settlement, which the Commission had approved, prohibited it from remanding for further evidentiary proceedings. Turning to the record as it stood, the Commission found, on second look, sufficient foundation for a FERC decision.
 
 
 13
 Recalling its earlier statement of the issue, FERC held that the ALJ had misassigned the proof burden. Sea Robin, not Commission staff, bore the burden of proof; it was incumbent upon the pipeline, in view of its requested increase in rates, to show that its pattern of cost allocation (crediting revenues from the Gulf transportation service in lieu of allocating costs to that service) was just and reasonable. Given Machuga's presentation on behalf of the Commission staff and the absence of any opposing evidentiary showing by Sea Robin or Gulf, FERC reached these determinations: (1) Sea Robin plainly failed to carry the burden it must bear in section 4 proceedings; (2) despite notable deficiencies in the Commission staff's presentation, mainly regarding the comparability of Sea Robin's various rates, substantial evidence supported the Commission's findings. These findings were that the failure to allocate costs to the Gulf transportation service was not just and reasonable and that Sea Robin's revenue-crediting methodology was unduly discriminatory.
 
 
 14
 The Commission ordered Sea Robin to exclude the costs attributable to its Gulf service from the costs used to calculate its other customers' rates, to stop crediting the Gulf revenues against the other customers' costs, and the refund to its other customers any amount collected in excess of this adjusted rate since June 1, 1980. See Opinion No. 227-A, 31 F.E.R.C. p 61,188, at 61,382 (May 21, 1985). The Commission denied Sea Robin's petition for reconsideration of this opinion. See Opinion No. 227-B, 32 F.E.R.C. p 61,259 (Aug. 21, 1985).
 
 
 15
 In June 1985, Sea Robin submitted a new rate change filing, decreasing most of its rates other than Gulf's. The filing continued Sea Robin's past practice of crediting the Gulf revenues against the pipeline's total costs rather than attributing Gulf's costs only to Gulf, as the Commission had directed. The Commission suspended the rates[5] and ordered Sea Robin to file revised rates attributing the Gulf costs as ordered in Opinion No. 227-A. See Order Accepting for Filing and Suspending Tariff Sheets, 32 F.E.R.C. p 61,119 (July 24, 1985). Sea Robin petitioned for rehearing; the Commission denied the request. See Order Denying Rehearing, 33 F.E.R.C. p 61,036 (Oct. 17, 1985).
 
 III.
 
 16
 We turn first to the question the Commission described as vital to its determination: Who bore the burden of proving Sea Robin's rate methodology just or unjust? The Commission's disagreement with the ALJ over the characterization of the issue seems to us irrelevant to this determination. The Commission, we hold, bears the burden of proof in this case regardless of whether the issue is seen as the specific rate to be charged Gulf, as the ALJ thought, or as only the rate methodology to be used by Sea Robin in determining its other customers' rates, as the Commission believed. We therefore assume throughout that the Commission's characterization of the question as one concerning rate methodology is accurate.
 
 
 17
 This circuit has instructed FERC that "Section 4(e) ... cannot be used by the Commission to institute any change in a ratemaking component, such as cost allocation, that does not represent at least partial approval of the change for which the enterprise had petitioned in its filing." Transco, 642 F.2d at 1345. Such a Commission-initiated change in either the "rates or their method of calculation," id. at 1344, can be accomplished only upon the agency's compliance with the strictures of section 5. Thus, "when the Commission imposes a change not proposed by the natural gas company--including an alteration in an unchanged part of a proposed higher rate--it must first find that the existing provision is unjust or unreasonable." ANR Pipeline Co. v. FERC, 771 F.2d 507, 514 (D.C.Cir.1985).
 
 
 18
 The Commission's action in this case is of this latter, section 5 type. The rate methodology FERC imposed on Sea Robin was not proposed by the pipeline; thus, the order cannot represent an approval, in whole or part, of changes suggested by Sea Robin. Nor was the Commission's methodology a return to Sea Robin's pre-filing rates; the order, in other words, also does not represent a rejection of proposed new rates and a reinstatement of old, established rates. The Commission's action, therefore, does not fall into the narrow section 4 range of acceptance or disapproval of a pipeline's proposed changes; rather, the order imposes on Sea Robin a completely new rate prescription, neither proposed nor previously used by the pipeline. Such action is authorized only under section 5. See City of Willcox v. FPC, 567 F.2d 394, 402 (D.C.Cir.1977), cert. denied, 434 U.S. 1012, 98 S.Ct. 724, 54 L.Ed.2d 755 (1978).
 
 
 19
 The Commission cites this court's opinion in Cities of Batavia v. FERC, 672 F.2d 64 (D.C.Cir.1982), to support its contention that resolution of the Gulf transportation issue involves the exercise of section 4 powers, so that the burden of proof is on Sea Robin. See Opinion No. 227-A, 31 F.E.R.C. at 61,380-81. In Cities of Batavia, the court stated that it did "not read Transco as precluding the Commission from reviewing a revised rate completely to assure that all its parts--old and new--operate in tandem to insure a 'just and reasonable' result and from ordering refunds if the previously approved fuel clause operates with new provisions to produce an over-recovery." Id. at 77. FERC suggests that this language authorizes it to demand that the pipeline justify the old as well as the new aspects of its rate, on penalty of rejection and refund.
 
 
 20
 The Cities of Batavia decision neither contradicts nor limits our interpretation of Transco. Cities of Batavia merely observes that in a section 4 proceeding, the Commission may evaluate the new proposed rates in light of all the old, existing provisions. If the Commission disapproves of the interaction between old and new rate provisions, it has the power under section 4 to reject the new rate, partially or completely, and reinstate the old one. But neither section 4 nor the Cities of Batavia opinion gives the Commission the authority to reject, post hoc, a previously accepted provision or to specify what should replace it.
 
 
 21
 Thus, the Commission's action in this case is an exercise of its authority under section 5 and can be upheld only if it is consistent with the constraints imposed by that section. The Commission staff must bear the burden of proving both that the existing provision is unjust or unreasonable and that the proposed replacement is just and reasonable. In addition, FERC may order only prospective relief if it finds a previously accepted provision unlawful. Because the Commission has not satisfied these section 5 requirements, we reverse its decision.
 
 IV.
 
 22
 The Commission staff failed to carry the proof burden it must shoulder in this case. We cannot find substantial evidence on this record to show that Sea Robin's cost allocation methodology was unjust or unreasonable. As a result, the Commission had no authority under section 5 to revoke and replace that rate methodology.
 
 
 23
 The evidence on which the Commission relies is a brief passage from the testimony of Robert Machuga, a staff expert on rate design and cost allocation. See J.A. at 1. Machuga testified that he believed Gulf's rate should be determined through the same rate methodology applied to the other customers, rather than defined as a fixed rate. See J.A. at 3. He stated that the nature of Gulf's service was not sufficiently different from that of Sea Robin's other customers' to warrant unique treatment. He noted that Sea Robin itself was unable to identify separately the costs of the Gulf service; it therefore seemed expectable that these costs would be treated as part of the general costs from which rates were derived and Gulf's rates, like all others, would be based on the general formula.
 
 
 24
 Machuga contended that the existing rate methodology resulted in the other customers subsidizing Gulf. See id. The other customers' rates were derived from a formula that included the costs of Sea Robin's transportation service to Gulf. If revenues from the service to Gulf--which were credited against the total cost figure--did not cover all of the costs of serving Gulf, then the other customers would end up paying those costs as well as their own. The witness considered it likely that the Gulf revenues, under the fixed rate, did not cover the costs of the service. This inference rested on Machuga's determination that Gulf would be paying a rate of 10.01 cents per Mcf--more than twice its fixed rate--if it were treated like other customers receiving similar service. See id. at 11-12. Machuga believed that the probability that the Gulf rate fell below costs would be heightened under Sea Robin's proposal to double the volume it transported for Gulf. See id. at 3.
 
 
 25
 As the Commission apparently recognized, the question whether the existing methodology is unjust turns on whether Gulf's fixed, contract rate covers the cost of its service. If the rate does pay for the costs of service, then crediting Gulf's revenues against the system-wide costs will prevent other customers from paying for Gulf's service; but if the fixed rate is inadequate to cover the costs of service to Gulf, then a subsidy situation is inevitable under the existing methodology. The question, therefore, is whether the Commission staff demonstrated, by substantial evidence, that the costs of service to Gulf exceed the revenues collected under Gulf's fixed rate.[6]
 
 
 26
 The record includes two props for the contention that the cost of service to Gulf outruns revenues collected from this special customer. First, there is Machuga's claim that customers receiving comparable service and paying cost-based rates are paying over twice as much per Mcf as Gulf to transport their gas. See J.A. at 3; Opinion No. 227-A, 31 F.E.R.C. at 61,382. This comparison would be powerful evidence if it were documented and explained, but the Commission itself "pointed up the deficiencies of Staff's presentation with respect to the comparability of [Gulf's service with the others]." 31 F.E.R.C. at 61,381. The testimony on which the Commission relied, once characterized by the Commission as "superficial[ ]," 31 F.E.R.C. at 61,380, does not explain why Machuga believed the customers in question to be comparable to Gulf, how Sea Robin determined those customers' costs, whether such a determination could be applied to Gulf, or how much of the final rate paid by the other customers actually represented recoupment of costs. Without answers to such questions, FERC's dependence on Machuga's testimony simply shows inordinate faith in the conclusory assertions of an expert; such reliance on the laconic statement of a staff member cannot satisfy the requirement that the Commission act only upon substantial evidence.
 
 
 27
 The Commission also made some commonsense assertions. In the filing at hand, Sea Robin was requesting increases in its other rates based on increases in costs. Seeing no reason why costs of the Gulf service should not rise as well, the Commission observed that a rate which might once have been sufficient to cover costs of the Gulf transportation might no longer be adequate. Similarly, the larger the percentage of Sea Robin's total activities the Gulf transportation represents, the less likely it is that the fixed rate will cover Gulf's share of the costs. The fact that Sea Robin proposed to increase Gulf's volume, therefore, suggested that the existence of a subsidy situation would become even more likely. See Opinion No. 227-A, 31 F.E.R.C. at 61,382.
 
 
 28
 These observations, while hardly implausible, are nonetheless completely conjectural. No hard evidence in the record establishes that costs of the Gulf transportation were rising or that service to Gulf was becoming a greater percentage of Sea Robin's business. More importantly, even if such evidence existed, standing alone, it would not prove that the Gulf rate did not cover full costs of the service. In other words, if the rate were sufficient to cover the increase in costs or the expanding percentage of business then there would be no subsidy.
 
 
 29
 Neither Gulf nor Sea Robin attempted to refute Machuga's conclusion that other customers subsidized the Gulf service. The Commission, therefore, maintains that the record supports the Commission's position (that the system of cost allocation is unjust or unreasonable) more than it supports Sea Robin's position (that the system is just and reasonable). The question in this case, however, does not concern the relative weight of contrary evidence but the absolute weight of consistent evidence: the issue is whether the evidence on the record is sufficiently substantial to warrant a Commission conclusion that FERC's staff has shown the existing provision to be unjust. We conclude that the answer to that question is "no." As the Commission candidly commented, "[t]he Gulf transportation issue was relatively insignificant when compared to [others aired at the hearing]." 31 F.E.R.C. at 61,380. With other issues of greater moment to develop, FERC's staff simply did not carry the section 5 burden on the Gulf matter. The Commission, therefore, acted arbitrarily and outside of its statutory authority in ordering Sea Robin to change its rate methodology.[7]
 
 V.
 
 30
 Because the first, and principal, order in this case is invalid, the later orders necessarily fall as well. The order requiring Sea Robin to bring its subsequent rate filing into conformity with the methodology specified by the Commission in the first order, is now without foundation. The Commission, for the reasons explained above, lacked authority under section 5 to issue the first order; FERC was equally without authority to enforce that invalid order in the later rate filing.
 
 CONCLUSION
 
 31
 In this case, the Commission attempted to go beyond its section 4 authority to accept or disapprove rates, and sought to impose on the pipeline a rate methodology of the Commission's own design. In so acting, the Commission disregarded the proof burden requirement of section 5. FERC held Sea Robin's rate structure unjust or unreasonable, although the record did not contain substantial evidence in support of that holding. We therefore reverse the orders challenged by petitioner and remand the case to the Commission for any further action it deems appropriate in light of our disposition.[8]
 
 
 32
 It is so ordered.
 
 
 
 [1]
 This limitation is apparent from the language of the Act. Section 5 refers to FERC's power to "determine the just and reasonable rate ... to be thereafter observed and in force, and [to] fix the same by order." 15 U.S.C. Sec. 717d(a) (emphasis added). Section 5, we further note, conspicuously lacks the explicit provision for refunds and associated accounting requirements found in section 4. See id. at Sec. 717c(e)
 
 
 [2]
 The Gulf price is "fixed" in the sense that the contract does not allow the pipeline to impose, unilaterally, an increased rate simply by filing with FERC. The rate for which Gulf contracted cannot be raised without Gulf's agreement
 
 
 [3]
 A few of Sea Robin's other customers pay non-cost based rates because some part of their transportation service involves the use of pipeline owned by a third party. All of Sea Robin's other customers, except Gulf, pay cost-based rates. Gulf's transportation does not involve the use of any other pipeline's facilities
 
 
 [4]
 This record suggests two ways to assure that all of Gulf's costs are attributed to the Gulf service, just as each other service bears its share of the costs. First, Gulf's costs could be subtracted from the pipeline's total costs. The other customers' rates would then be determined by dividing the remaining costs by the total volume transported for all customers other than Gulf. In this scheme, neither Gulf's costs nor its volumes or revenues would play a role in the other customers' rate formula. This appears to be the method that the Commission had in mind. See Opinion No. 227-A, 31 F.E.R.C. at 61,382. At oral argument, Sea Robin's counsel offered another understanding of what the Commission might have intended. In this method, both Gulf's costs and its volumes are aggregated with the other customers' and the rate for all is determined by dividing total costs by total volumes. These two methods have the potential to generate significantly different rates (if the ratio of the other customers' costs to their volumes is significantly different from the ratio of Gulf's costs to its volumes). But both methods would avoid, as Sea Robin's revenue-crediting method does not, allowing other customers' payments to uniquely subsidize service to Gulf
 
 
 [5]
 Sea Robin's petition for review initially challenged an additional aspect of this order: the Commission's decision to subject the filing to the possibility of a refund order even though the filing requested lower, rather than higher, rates. See Brief for Petitioner Sea Robin Pipeline Co. at 25-30. The parties subsequently reached agreement on the disposition of this rate filing and suggested to the court, prior to oral argument, that the refund issue had thereby become moot. See Suggestion of Sea Robin Pipeline Company That One Issue Has Become Moot (filed April 11, 1986). We reserved decision on the mootness suggestion until after oral argument. We now accept the parties' suggestion that the issue has become moot since there is no longer any possibility that a refund obligation will be imposed
 
 
 [6]
 Arguably, even if a subsidy does exist, the rate might be just and reasonable because the subsidy is warranted by some other aspect of the situation. See ALJ Decision, 26 F.E.R.C. at 65,289-90 (suggesting differences that would justify charging Gulf a lower rate). But see Opinion No. 227-A, 31 F.E.R.C. at 61,381 (rejecting these justifications). We do not foreclose the possibility of such a justification; we merely point out that the Commission staff must at least demonstrate that a subsidy exists in this case in order to make a prima facie showing that the rate is unjust. Whether the FERC staff must then go on to demonstrate that no extenuating circumstances exist--or whether the burden of justification must be borne by the pipeline--is a question we need not, and do not, address
 
 
 [7]
 The first order also exceeds the Commission's authority under section 5 because it mandates retroactive relief. FERC ordered Sea Robin to refund to its customers, other than Gulf, any fees they had paid since June 1, 1980 in excess of the fees they would have paid under the new, Commission-directed methodology. See Opinion No. 227-A, 31 F.E.R.C. at 61,382. Sea Robin had a right to rely on the legality of the filed rate once the Commission allowed it to become effective. FERC may not order a retroactive refund based on a post hoc determination of the illegality of a filed rate's prescription
 
 
 [8]
 The Commission, of course, can institute a new section 5 proceeding at any time. If FERC's staff still believes Sea Robin's existing rate methodology may be unjust, it can proceed to investigate and, if staff persuasively presents the necessary evidence, the Commission may order Sea Robin to change its rate design prospectively to one approved by the Commission